[No. B229246. Second Dist., Div. Three. Jan. 15, 2013.]

YANIRA CASTANEDA, as Personal Representative, etc., et al., Plaintiffs and Respondents, v.
DEPARTMENT OF CORRECTIONS AND REHABILITATION, Defendant and Appellant.

1052

## COUNSEL

Kamala D. Harris, Attorney General, Steven M. Gevercer, Assistant Attorney General, Richard J. Rojo, Mark V. Santa Romana, Christopher M. Hill and D.L. Helfat, Deputy Attorneys General, for Defendant and Appellant.

Public Justice, Adele P. Kimmel; Willoughby Doyle and Conal Doyle for Plaintiffs and Respondents.

OPINION

**ALDRICH, J.—**

## INTRODUCTION

In this opinion, we address two distinct issues arising from a lawsuit against the State of California. The first issue is whether the state's litigation conduct estops it from raising noncompliance with the claim presentation provisions of the Government Claims Act (the Act) (Gov. Code, §§ 810, 900 et seq., 945.4).[1] The second issue is the state's liability under section 845.6 for failure to summon medical care for a prisoner.

The state's Department of Corrections and Rehabilitation (variously the State or Department of Corrections) appeals from a judgment in favor of plaintiffs, the estate of Francisco Castaneda and his heir Vanessa Castaneda.[2] The jury found that the State violated section 845.6 in that its employees knew or had reason to know Castaneda was in need of immediate medical care while in custody but failed to take reasonable action to summon care. We first hold nothing in the State's conduct estopped it from raising the heir's failure to file a government tort claim. We next hold, as a matter of law, the State is immune to liability for the decisions that resulted in Castaneda failing to undergo a biopsy while he was in State custody. (§§ 844.6, 845.6.) Accordingly, the judgment is reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background

1. *County custody*

Francisco Castaneda was convicted of violating Health and Safety Code section 11378 for possession of a controlled substance with the intent to sell and proceeded into custody in Orange County from October 21 to 26, 2004, and January 16 to May 15, 2005. He was then in custody in Los Angeles County from October 28 to December 5, 2005. While in custody in Orange and Los Angeles Counties, Castaneda complained of pain during urination and of a growth that had been on his penis for approximately two years. He was seen by nurses and a physician.

2. *State custody*

Castaneda was transferred to State custody on December 5, 2005, and remained there until January 12, 2006.

---

[1] All further undesignated statutory references are to the Government Code.

[2] For clarity, we will refer to Yanira and Vanessa Castaneda by their first names, but mean no disrespect thereby.

At North Kern State Prison, Castaneda underwent an initial medical intake screening. During the screening, Dr. Andrew Leong saw a discoloration on Castaneda's penis and noted Castaneda's difficulty in retracting the foreskin. Neither of these conditions is a symptom of cancer, but Dr. Leong told Castaneda to follow up with the yard physician and referred Castaneda to a urologist for a circumcision.

Three weeks later, Dr. Leong noted discharge, a foul smell, and that Castaneda had difficulty retracting the foreskin. In his differential diagnosis, Dr. Leong considered a thickened foreskin, a skin rash, or cancer. To "rule out skin pathology," i.e., cancer, required a urology biopsy. Because Dr. Leong was not a urologist, his job was not to treat, but to refer Castaneda to a urologist.

Dr. Leong referred Castaneda for a urology consult to undergo a biopsy to rule out (1) squamous cell carcinoma of the penis, and (2) leukoderma with phimosis (discoloration). The State's "Health Care Services Physician Request for Services" form requires the referring doctor to indicate whether the "Requested Treatment/Service is," "Emergent," "Urgent," or "Routine." Dr. Leong circled "Routine," which under Department of Corrections policy meant the requested service should be provided within 90 days. Dr. Leong agreed that his referral was not really routine, but explained the condition did not require a 72-hour response, which would make the referral "Urgent." As Dr. Leong wanted to select a timeframe for the service, he wrote, "ASAP, within one to two weeks" further down on the form, under "Estimated time for service delivery, recovery, rehabilitation and follow-up." Dr. Leong never saw Castaneda again because the prisoner was transferred before the next scheduled appointment.

Procedurally, the Health Care Services Physician Request for Services forms are sent to the utilization management nurse who relies on the three designations, "Emergent," "Urgent," and "Routine," when passing the forms on to the chief medical officer for review. Dr. Leong's Health Care Services Physician Request for Services form for Castaneda was denied by Dr. Robert Mekemson, North Kern State Prison's acting chief physician and surgeon. The reason for the denial, Dr. Mekemson explained, was that Castaneda was being transferred the following morning to his permanent placement at Richard J. Donovan Correctional Facility where the prisoner would be screened again and the "Routine" referral would be handled.

Castaneda arrived at Donovan on January 12, 2006, and was examined by Nurse Practitioner Susan Pasha on February 7, 2006, within the 90-day period of the "routine" referral. Nurse Pasha was aware that Dr. Leong had recommended a urology consult to rule out carcinoma. Nurse Pasha noted a

"two centimeter by two centimeter raised, white yellow, irregular-shaped lesion . . . white macular [flat] patches . . . to scrotum and . . . foreskin." She noted her assessment of "Genital lesion foreskin. *Rule out squamous cell carcinoma*. Rule out gonorrhea/chlamydia. Vitiligo region question." (Italics added.) In the notes, she stated, "Urgent urology referral. Cipro 500 one time. Doxycycline 500 twice a day for seven days. Treat prophylactic and then follow up in a month, GC Chlamydia probe." Nurse Pasha also wrote a referral to rule out squamous cell carcinoma on which she indicated, "Needs excision and biopsy of lesion. Please evaluate and treat." Nurse Pasha did not follow up on this referral, despite the Department of Corrections's policy requiring her to keep track of whether the request for the consult had been performed.

Castaneda was scheduled to go to a urology clinic on March 29, 2006. However, he was released to the federal authorities on March 26, 2006.

### 3. *Diagnosis*

Castaneda was in the custody of Immigration and Customs Enforcement from March 26, 2006, to February 5, 2007.

Nine days after his release from federal custody, Castaneda was diagnosed by doctors at Harbor-UCLA Medical Center with invasive squamous cell carcinoma, keratinizing type, involving the foreskin and glands and invading the corpus spongiosum penis. Castaneda had his penis amputated, but the cancer had spread to his lymph nodes. He died a year later on February 16, 2008.

### II. Procedural history

Castaneda filed a complaint in federal court, which included medical malpractice allegations against the treating physicians. That action is ongoing.

Turning to state court, Castaneda presented a timely government tort claim under the Act and after it was rejected, brought this action in January 2008 alleging a single cause of action for violation of section 845.6. Nearly 16 months after Castaneda died, in May 2009, Yanira, the decedent's sister, was substituted in on behalf of Castaneda's estate with respect to the survivor action, and Castaneda's daughter Vanessa as heir and beneficiary of the estate, through her mother and guardian, Lucia Pelayo, amended the complaint to allege a new, separate cause of action for wrongful death. (Code Civ. Proc., §§ 377.60–377.62.) Vanessa never filed a government tort claim.

The State moved for judgment on the pleadings on the ground, inter alia, that the estate and Vanessa failed to comply with the Act, with the result they

were barred from bringing suit against the State. Recognizing Vanessa had never filed a government tort claim on her own behalf, plaintiffs argued that the State was barred by the doctrine of equitable estoppel from raising her failure to comply with the Act. The trial court granted Yanira's and Vanessa's amendments to the complaint and denied the State's motion for judgment on the pleadings.

After trial, the jury returned a verdict in favor of the estate and Vanessa in the amounts of $234,557 and $1.5 million, respectively. The State filed its timely appeal. Additional facts will be presented in the discussion portion of this opinion.

## DISCUSSION

### I. Government Claims Act

"A motion for judgment on the pleadings, like a general demurrer, challenges the sufficiency of the plaintiff's cause of action and raises the legal issue, regardless of the existence of triable issues of fact, of whether the complaint states a cause of action. [Citation.]" (*Brownell v. Los Angeles Unified School Dist.* (1992) 4 Cal.App.4th 787, 793 [5 Cal.Rptr.2d 756].) On appeal, we apply the same standard of review as with a general demurrer. (*Baughman v. State of California* (1995) 38 Cal.App.4th 182, 187 [45 Cal.Rptr.2d 82].) "We consider evidence outside the pleadings which the trial court considered without objection. [Citation.]" (*Ibid.*) " 'We review the complaint de novo to determine whether [it] alleges facts sufficient to state a cause of action under any legal theory. [Citation.]' [Citation.]" (*DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 972 [14 Cal.Rptr.3d 787].)

██ "The intent of the Tort Claims Act is not to expand the rights of plaintiffs against governmental entities. Rather, the intent of the act is to confine potential governmental liability to rigidly delineated circumstances. [Citation.] [¶] The Tort Claims Act requires that any civil complaint for money or damages first be presented to and rejected by the pertinent public entity [citations]. The act creates a bond between the administrative claim and the judicial complaint. Each theory of recovery against the public entity must have been reflected in a timely claim. In addition, the factual circumstances set forth in the claim must correspond with the facts alleged in the complaint. [Citation.]" (*Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1776 [39 Cal.Rptr.2d 860].) The aim of the claim statutes is to provide sufficient information to enable the public entity to investigate claims and settle, if appropriate, without the expense of litigation, and to take the potential claim into account in fiscal planning. (*Nelson v. County of Los*

*Angeles* (2003) 113 Cal.App.4th 783, 797 [6 Cal.Rptr.3d 650]; *Johnson v. San Diego Unified School Dist.* (1990) 217 Cal.App.3d 692, 697 [266 Cal.Rptr. 187].)

"Compliance with the claims provisions is mandatory. [Citations.]" (*Johnson v. San Diego Unified School Dist., supra,* 217 Cal.App.3d at p. 697.) Fulfilling the requirements of the tort claims presentation procedure is a condition precedent to filing suit; it is not an affirmative defense. (*Munoz v. State of California, supra,* 33 Cal.App.4th at p. 1777.) Thus, an injured party may not maintain an action against a public entity unless it has presented a claim to the entity, in this case the California Victim Compensation and Government Claims Board (the Board). (§ 945.4.) The State challenges Castaneda's and Vanessa's compliance with the mandatory claims provisions.

a. *Castaneda's tort claim was sufficient.*

The State contends that the judgment in favor of the estate must be reversed because the sole cause of action against the State, for failure to summon immediate medical care, was not fairly reflected in Castaneda's government tort claim.

Castaneda's tort claim explained the circumstances leading to his injury thusly: "Cal DOC failed to provide adequate and necessary medical care for a known serious medical need, resulting in the failure to timely diagnose and treat penile cancer, resulting in penectomy and development of metastatic terminal cancer."

In his ensuing complaint against the State only, Castaneda alleged his action is based on a violation of section 845.6. Section 845.6, as will be amplified later, carves out of the general immunity of the State for injuries to prisoners, limited State liability when a public employee, acting within the scope of his employment, "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."

■ In its motion for judgment on the pleadings, the State specifically argued Castaneda's tort claim did not allege a failure to summon immediate medical care. As it did below, the State cites *Nelson v. State of California* (1982) 139 Cal.App.3d 72 [188 Cal.Rptr. 479] and *Watson v. State of California* (1993) 21 Cal.App.4th 836 [26 Cal.Rptr.2d 262] (*Watson*), both of which hold that a violation of section 845.6 and medical malpractice are different causes of action. (*Nelson v. State of California, supra,* at pp. 80–81; *Watson, supra,* at p. 844.) In denying the State's motion, the trial court ruled

that Castaneda's tort claim provided the State with adequate information to investigate Castaneda's charges. (*Stockett v. Association of Cal. Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441 [20 Cal.Rptr.3d 176, 99 P.3d 500] (*Stockett*).) We agree.

■ "[A] claim need not contain the detail and specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to have done.' [Citations.] As the purpose of the claim is to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions [citation], the claims statute 'should not be applied to snare the unwary where its purpose has been satisfied' [citation]." (*Stockett, supra*, 34 Cal.4th at p. 446.) To be fortified against a demurrer, the complaint should allege the factual basis for recovery that fairly reflects the written claim. (*Id.* at p. 447.)

Castaneda's tort claim contained the facts sufficient to give the Board notice to investigate and evaluate his claim. The claim cited the dates and place of Castaneda's State custody and "generally stated the 'circumstances' " of the Department of Corrections's response to Castaneda's alleged immediate medical need. (*Stockett, supra*, 34 Cal.4th at p. 447.) Castaneda's complaint was predicated on the same fundamental acts of the same defendant, namely the Department of Corrections, as his claim. (*Ibid.*) Therefore, Castaneda notified the Board of his failure-to-summon-medical-care cause of action as he was required to do by sections 910 and 945.4.

b. *The trial court abused its discretion in denying the State's motion for judgment on the pleadings with respect to Vanessa's wrongful death cause of action because she never complied with the Act.*

1. *Vanessa did not file a tort claim and so she never fulfilled a condition precedent to her suit.*

This is not a case in which Vanessa filed a tort claim late, filed an incomplete or insufficient tort claim form, or filed her claim with the wrong entity. Vanessa *never filed a tort claim on her own behalf.*

■ Generally, each claimant must file his or her own tort claim. When people suffer separate and distinct injuries from the same act or omission, they must each submit a claim. One claimant cannot rely on a claim presented by another. (*California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1592 [126 Cal.Rptr.3d 160].) This rule applies where different claimants are alleging survivor theories and wrongful death theories of liability arising from the same transaction. (*Nelson v. County of Los Angeles, supra*, 113 Cal.App.4th at pp. 796–797

[separate tort claims required for survival cause of action by injured decedent and wrongful death claim by mother]; *Pacific Tel. & Tel. Co. v. County of Riverside* (1980) 106 Cal.App.3d 183, 190–192 [165 Cal.Rptr. 29] [separate tort claims required for decedent's employer for workers' compensation and widow's wrongful death claim]; *Roberts v. State of California* (1974) 39 Cal.App.3d 844, 847–848 [114 Cal.Rptr. 518] [same].)

■ It has long been the law in California that "[a]n action for wrongful death is wholly distinct from an action by the decedent, in his lifetime, for the injuries which ultimately cause his death [citation]. An important right of one class of plaintiffs has been built upon this distinction in the area of governmental immunity [citation]." (*Lewis v. City and County of San Francisco* (1971) 21 Cal.App.3d 339, 341 [98 Cal.Rptr. 407].) Castaneda's theory of recovery was based on his survival causes of action (his personal injuries while alive) while Vanessa's theory was based on her entirely distinct injury arising from Castaneda's death. Accordingly, Vanessa could not utilize Castaneda's tort claim for his predeath personal injuries as a substitute for her own wrongful death claim. Because Vanessa did not comply with the Act, she cannot state a cause of action. (*DiPirro v. American Isuzu Motors, Inc., supra*, 119 Cal.App.4th at p. 972.) The trial court abused its discretion when it denied the State's motion for judgment on the pleadings with respect to Vanessa.[3]

2. *There are no facts to support estoppel for Vanessa's noncompliance.*

The trial court denied the State's motion for judgment on the pleadings ruling that the State was estopped to assert noncompliance with the Act. The court based its ruling on the State's "affirmative conduct throughout the subject litigation (and the related federal action)," which conduct "deterred plaintiff from timely filing a claim." The court cited the following facts to support estoppel: (1) the extensive discovery in the state and federal actions; (2) the court found the State had "recognized in its May 2008 Case Management Statement that plaintiffs could amend the pleading to add the heirs"; (3) the mediation in July 2008, which apparently included discussion of Vanessa's wrongful death cause of action; and (4) the State first raised Vanessa's failure to comply with the Act over a year after expiration of Vanessa's statutory time to present a late claim. Finding the State was on notice of Vanessa's claim, the court ruled the State would suffer no prejudice from an amendment to add a wrongful death action on behalf of Vanessa. We

---

[3] We have considered and rejected Vanessa's argument based on the doctrine of substantial compliance. That doctrine applies only when there is a defect in form; it does not apply if a claimant has not filed a tort claim at all. (*Nelson v. County of Los Angeles, supra*, 113 Cal.App.4th at p. 797.)

conclude that none of the conduct listed by the trial court estopped the State from raising noncompliance with the Act.

 "A public entity may be estopped from asserting the limitations of the tort claims statutes where its agents or employees *have prevented or deterred the filing of a timely claim by some affirmative act.* The required elements for an equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his or her injury. [Citation.]" (*Munoz v. State of California, supra,* 33 Cal.App.4th at p. 1785, italics added.)

"Estoppel most commonly results from misleading statements *about the need for or advisability of a claim . . . .*" (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 445 [256 Cal.Rptr. 766, 769 P.2d 948], italics added.) "In each [case], the public entity or one of its agents engaged in some *calculated conduct or made some representation or concealed facts which induced the plaintiff not to file* a claim or bring an action within the statutory time . . . ." (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1047 [75 Cal.Rptr.2d 777], italics added.)

 Vanessa made no showing that the State made any misrepresentation or concealed a material fact that Vanessa relied on to decide not to file a claim. She points to nothing in the statements made by the deputy attorney general during discovery, in the State's case management statement, or in the positions taken to defend the State during this litigation, that constitutes an affirmative misrepresentation or concealment of material facts concerning the need for, or advisability of, a tort claim. We are also surprised that the trial court could, as it did, base estoppel on statements made, or discussions had, *during mediation.* "[S]tatements made during mediation and mediation materials are confidential not only during the mediation, but also after the mediation ends." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 580 [80 Cal.Rptr.3d 83, 187 P.3d 934].) In sum, the conduct cited by the trial court does not amount to any affirmative acts designed to induce Vanessa to refrain from complying with a condition precedent to filing suit.[4]

---

[4] We decline to read into the comment in the State's case management statement that "Plaintiff *may* amend the Complaint to add the heirs and representatives of the Estate of Francisco Castaneda who is now deceased" (italics added) as *permission* to amend the complaint in the known absence of a tort claim, or as evidence that the deputy attorney general *knew whether Vanessa had complied with the Act,* Vanessa's arguments to the contrary notwithstanding. Simply because the deputy attorney general was aware that Castaneda had died and left an heir, *does not mean that the deputy attorney general knew whether that heir*

■ Moreover, acts or misleading statements which can estop a public agency are those made by the "public entity" or "its agents or employees," in this case the Department of Corrections or the Board, not the deputy attorneys general representing the public entity during litigation. (*John R. v. Oakland Unified School Dist., supra,* 48 Cal.3d at p. 445 [teacher's threats prevented sexual abuse victim student from pursuing claim within statutory period]; see, e.g., *Fredrichsen v. City of Lakewood* (1971) 6 Cal.3d 353, 355–356 [99 Cal.Rptr. 13, 491 P.2d 805] [defendant city misrepresented that private corporation, not city, was responsible for maintaining sidewalk on which plaintiff fell]; *Rand v. Andreatta* (1964) 60 Cal.2d 846, 850 [36 Cal.Rptr. 846, 389 P.2d 382] [defendant county's claim agent told plaintiff she need not obtain counsel and all her rights would be protected]; *Ocean Services Corp. v. Ventura Port Dist.* (1993) 15 Cal.App.4th 1762, 1776 [19 Cal.Rptr.2d 750] [defendant entity asked plaintiff in writing to wait before commencing action, delaying filing of claim until the time period passed]; *Bruce v. Jefferson Union High Sch. Dist.* (1962) 210 Cal.App.2d 632, 634 [26 Cal.Rptr. 762] [student followed instructions from school officials about how to protect rights in case of injury].) Where the misleading statements *that give rise to estoppel are those made by the defendant public agency, its employees or agents, specifically about the claims filing duty, it defies logic that positions taken or not taken by an opposing party's attorney in litigation, which never mention any part of the Act,* could give rise to estoppel under the Act. (Cf. *Becerra v. Gonzales* (1995) 32 Cal.App.4th 584, 596 [38 Cal.Rptr.2d 248] [defendants " 'did not have a duty to advise [injured plaintiffs] of the law, or of the necessity of filing a claim' " where defendant had no special relationship with plaintiffs *"except as an opposing party in the litigation"* (italics added)]; *Orr v. City of Stockton* (2007) 150 Cal.App.4th 622, 636 [58 Cal.Rptr.3d 662] [by merely sending plaintiff information he requested in his "petition to preserve evidence," public entity did not induce plaintiff into believing no further conduct was necessary; public entity defendant had no affirmative duty to remind plaintiff he had not yet complied with the Act].) Stated differently, nothing cited by the trial court or Vanessa constitutes *calculated conduct* by the State designed to *induce Vanessa* not to file a tort claim. (*Ortega v. Pajaro Valley Unified School Dist., supra,* 64 Cal.App.4th at p. 1047.) The deputy attorney general had no special relationship with Vanessa or her attorneys other than as an opposing party in the litigation, and

*had filed a claim.* Vanessa points to nothing in the pleadings or in the documents the trial court considered to indicate that she had mentioned the Act to the deputy attorney general. And, even if the deputy attorney general were aware that Vanessa had not complied with the Act, the result would be the same. " 'It is well-settled that claims statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances surrounding the claim. *Such knowledge—standing alone—constitutes neither substantial compliance nor basis for estoppel.'* [Citations.]" (*Johnson v. San Diego Unified School Dist., supra,* 217 Cal.App.3d at p. 697, fn. 1, italics added.)

so the State's attorney had no affirmative obligation to remind Vanessa to comply with the Act. (*Orr v. City of Stockton, supra,* at p. 636.)

The trial court also concluded the State was estopped from asserting noncompliance with the Act because the State waited until after the statutory time to present a late claim expired to move for judgment on the pleadings. Effectively, the court found by remaining silent about Vanessa's obligation to comply with the Act until the deadline to file a late claim passed, the State snared Vanessa into noncompliance. However, " ' "[m]ere silence will not create estoppel unless the silent party was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak . . . ." ' [Citation.]" (*Becerra v. Gonzales, supra,* 32 Cal.App.4th at p. 596; cf. *Ard v. County of Contra Costa* (2001) 93 Cal.App.4th 339, 347–348 [112 Cal.Rptr.2d 886] (*Ard*) [appellate court declined to address whether entity's attorney's silence estopped entity].) As we have explained, the State, as opposing party in litigation, had no affirmative duty to remind Vanessa's lawyers about their obligation to file a tort claim, particularly where the Act was never discussed. (*Becerra v. Gonzales, supra,* at p. 596; *Orr v. City of Stockton, supra,* 150 Cal.App.4th at p. 636.) Therefore, the State's silence is not grounds for estoppel.

*Ard, supra,* 93 Cal.App.4th 339, cited by Vanessa, is distinguished. There, the appellate court reversed the sustaining of a demurrer and cited the following facts that might estop the defendant county from raising the untimely complaint as a defense: After obtaining leave to file a late claim, the plaintiff's counsel told the county's attorney she intended to submit a second claim to the county and when it was rejected, file an amended complaint naming the county as a defendant for the first time. The county's attorney responded that the amended complaint should be served directly on the county. (*Id.* at p. 342.) After the second tort claim was rejected, the plaintiff obtained *a signed stipulation from the county's attorney* agreeing to allow the plaintiff to substitute an amended complaint for the untimely one. (*Ibid.*) Holding that estoppel is a factual question that could not be addressed at the demurrer stage, the *Ard* court never determined whether these facts gave rise to estoppel. Even if the facts of *Ard* were enough to estop the public entity there, its facts do not aid Vanessa. There is no evidence in this record that the parties ever discussed the Act, let alone executed a stipulation, before the State moved for judgment on the pleadings.

Nor could Vanessa have reasonably relied on the deputy attorney general's conduct to decide not to file a claim, and so the fourth element of estoppel is not present. (*Munoz v. State of California, supra,* 33 Cal.App.4th at p. 1785.) It is significant that Vanessa was represented by a team of lawyers with 74 years of combined legal experience. "In general, the law 'particularly' disfavors estoppels 'where the party attempting to raise the estoppel is

represented by an attorney at law.' [Citation.] For purposes of analyzing estoppel claims, attorneys are 'charged with knowledge of the law in California.' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1316 [104 Cal.Rptr.3d 195, 223 P.3d 57].) Vanessa's attorneys were not entitled to rely on the deputy attorneys general to inform them of the law. (*Becerra v. Gonzales, supra,* 32 Cal.App.4th at p. 596; *Life v. County of Los Angeles* (1991) 227 Cal.App.3d 894, 902 [278 Cal.Rptr. 196] [no estoppel; attorney could not reasonably rely on advice of hospital employee about filing tort claim].) This is especially so where Vanessa's attorneys knew about the Act's filing requirement, as they *had already filed a tort claim on behalf of Castaneda.* Our Supreme Court "long ago explained, one who acts with full knowledge of plain provisions of law and their probable effect on facts within his or her knowledge, especially where represented by counsel, may claim neither ignorance of the true facts nor detrimental reliance on the conduct of the person claimed to be estopped, two of the essential elements of equitable estoppel. [Citation.]" (*Steinhart v. County of Los Angeles, supra,* at p. 1317.) Stated differently, although estoppel is a question of fact (*ibid.*), the factors cited by the trial court in this case do not support estoppel.

Vanessa counters that no case holds that the Act requires beneficiaries to file a tort claim for wrongful death that accrued after the decedent's lawsuit was filed. She argues that a separate filing requirement while the estate's case was ongoing elevates form over substance and contravenes the purposes of the Act. Vanessa overlooks that she was obligated under the Act to file her own tort claim reflecting her theory of recovery. She could not substitute Castaneda's tort claim for her own. The State was on notice that Castaneda was suing for the injuries he sustained while alive. Merely because the Board denied Castaneda's claim does not mean that it would have reached the same result for Vanessa. The State's exposure to Castaneda's damages is vastly different in kind and nature from its exposure to a wrongful death action by a daughter with all of the attendant possibilities of extremely high damages if liability were established. Because Vanessa did not give the Board an indication that she might bring a wrongful death action before she sought to amend the complaint to add her cause of action, she denied the Board the opportunity to investigate the facts particular to her claim, to decide whether to settle it, and hence to include her claim in its fiscal planning. (*Johnson v. San Diego Unified School Dist., supra,* 217 Cal.App.3d at pp. 696–697.) Consequently, requiring Vanessa to file a separate tort claim based on wrongful death comports with the purpose of the Act and does not elevate form over substance.[5]

---

[5] Vanessa cites us to federal cases addressing the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.) in an effort to persuade us that she should not have been required to file a tort claim where the State was already deeply embroiled in litigation over Castaneda's tort claim. Federal

Vanessa next argues that under the State's logic, whenever a plaintiff injured by a public entity dies during litigation, the case must be stayed while the heir complies with the tort claim filing requirement. Vanessa overstates the argument. She knew of her tort claim on February 16, 2008, when Castaneda died, and could have filed a tort claim but never did; she waited 15 months after Castaneda's death to seek to amend the complaint to include her new cause of action. Vanessa has not demonstrated why a stay would have been necessary had she timely acted.

<span style="background:black"></span> Finally, Vanessa cites *Phillips v. Desert Hospital Dist.* (1989) 49 Cal.3d 699 [263 Cal.Rptr. 119, 780 P.2d 349] (*Phillips*) to argue that the mediation brief and case management statement she served on the Attorney General's office constitutes a "claim" that triggered the notice and defense-waiver provisions of sections 911[6] and 911.3.[7] In *Phillips*, the plaintiff sent the hospital a notice under Code of Civil Procedure section 364, subdivision (a), which requires potential medical malpractice plaintiffs to notify health care providers of their intent to sue 90 days before filing a complaint. (*Phillips, supra*, at p. 703.) The Supreme Court held that the Code of Civil Procedure section 364 notice activates the Act's notice and defense-waiver provisions in sections 911 and 911.3, treating the Code of Civil Procedure section 364 notice as a tort claim under the Act. (*Phillips, supra*, at p. 701.) The Supreme Court concluded "that a document constitutes a 'claim as presented' triggering sections 910.8, 911 and 911.3, *if it discloses the existence of a* 'claim' which, if not satisfactorily resolved, *will result in a lawsuit against the entity.* [Citation.] A public entity's receipt of written *notice* that a claim for monetary damages exists and that *litigation may ensue* places upon the public entity the responsibility, and gives *it the opportunity*, to notify the potential plaintiff pursuant to sections 910.8 and 911 *of the defects that render the document insufficient* under sections 910 and 910.2 and *thus might hamper investigation and possible settlement of the claim.* Such a written notice claiming monetary damages thereby satisfies the

---

cases are not controlling, especially federal cases concerning a federal statute not at issue in this case. (*United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1115 [259 Cal.Rptr. 65].)

[6] Section 911 reads, "Any defense as to the *sufficiency of the claim* based upon a defect or omission in the claim *as presented* is waived by failure to give notice of insufficiency with respect to the defect or omission as provided in Section 910.8, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant." (Italics added.)

[7] Section 911.3 concerns what a public entity must do when a claim *is filed late* and provides in subdivision (b) that "Any defense as to the time limit for presenting a claim described in subdivision (a) is waived by failure to give the notice set forth in subdivision (a) within 45 days after the claim is presented, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant."

purposes of the claims act—to facilitate investigation of disputes and their settlement without trial if appropriate [citation]." (*Id.* at p. 709, italics added.)

Yet, unlike *Phillips*, Vanessa never filed *any* written document indicating her intent to sue. Following Vanessa's logic, if papers filed after litigation commenced—motions, points and authorities, and the like—were treated as tort claims under the Act, then a complaint could substitute as a claim, subverting the purposes of the Act. The exception would swallow the rule. Finally, as explained, because Vanessa's cause of action was wholly distinct from Castaneda's, nothing he filed could be considered a tort claim on her behalf. Thus, not only did Vanessa's mediation brief, her case management statement, and Castaneda's documents, not constitute a tort claim as presented under *Phillips*, but also it is undisputed that the Board never received her papers filed in this action so the notice and defense-waiver provisions of sections 911 and 911.3 were not triggered.

As Vanessa never complied with the Act's requisites, and as there is no basis to estop the State from raising her noncompliance, the judgment in favor of Vanessa must be reversed.

## II. The State's immunity under sections 844.6 and 845.6

*The undisputed evidence establishes that the State is immune to suit pursuant to sections 844.6[8] and 845.6.*

Public entities in California are not liable for tortious injury unless liability is imposed by statute. (§ 815.) "[S]overeign immunity is the rule in California; governmental liability is limited to exceptions specifically set

---

[8] Section 844.6 reads, "(a) Notwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1 (commencing with Section 3500) of Part 3 of the Penal Code, a public entity is not liable for: [¶] (1) An injury proximately caused by any prisoner. [¶] (2) An injury to any prisoner. [¶] (b) Nothing in this section affects the liability of a public entity under Article 1 (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code. [¶] (c) Except for an injury to a prisoner, nothing in this section prevents recovery from the public entity for an injury resulting from the dangerous condition of public property under Chapter 2 (commencing with Section 830) of this part. [¶] (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission. The public entity may but is not required to pay any judgment, compromise or settlement, or may but is not required to indemnify any public employee, in any case where the public entity is immune from liability under this section; except that the public entity shall pay, as provided in Article 4 (commencing with Section 825) of Chapter 1 of this part, any judgment based on a claim against a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state for malpractice arising from an act or omission in the scope of his employment, and shall pay any compromise or settlement of a claim or action, based on such malpractice, to which the public entity has agreed."

forth by statute." (*Cochran v. Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 [205 Cal.Rptr. 1].) Section 844.6, subdivision (a)(2) establishes the State's immunity to liability for injuries to prisoners. Section 845.6 both affirms the public entity immunity to liability for furnishing medical care, and creates a narrow exception to that immunity.

Section 845.6 states in relevant part, "Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856 [(concerning mental illness and addiction)], a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."

 The first clause of section 845.6 establishes the immunity generally of both the public entity and its employees from liability "for injury proximately caused by the failure of the employee to *furnish or obtain medical care* for a prisoner in his custody." (Italics added.) The second phrase creates a limited public-entity liability when (1) the public employee "knows or has reason to know [of the] need," (2) of "*immediate* medical care," and (3) "fails to take reasonable action to *summon* such medical care." (§ 845.6, italics added.)

Section 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employees' malpractice in providing that care. The 1963 Law Revision Commission comments to section 845.6 clarify, "This section limits the duty to provide medical care for prisoners to cases where there is actual or constructive knowledge that the prisoner is in need of immediate medical care. *The standards of medical care to be provided* to prisoners involve *basic governmental policy that should not be subject to review in tort suits for damages.*" (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 845.6, p. 459, italics added.) Thus, section 845.6 creates out of the general immunity a limited cause of action against a public entity for its employees' failure to *summon* immediate medical care only. (*Watson, supra,* 21 Cal.App.4th at p. 841.) The statute does not create liability of the public entity for malpractice in furnishing or obtaining that medical care. (*Id.* at pp. 841–842; see *Nelson v. State of California, supra,* 139 Cal.App.3d at pp. 78–79 [state liable for failure to summon medical care; medical malpractice causes of action may only be brought against employee providing care].) Nor does the statute make the State " 'vicariously liable for the medical malpractice of its employees. [Citation.] Although the State is

required to pay the judgment assessed against its employees for medical malpractice committed against a prisoner, the State is immune from suit directly. [Citations.]' [Citation.]" (*Watson, supra,* at p. 842.)

A narrow reading of section 845.6 is also compelled as a matter of statutory interpretation. First, the duty to summon is presented as the exception to the broad, general immunity for failing to furnish or provide medical care. Second, section 845.6 imposes the duty to summon on "public employees" generally, not medical care providers in particular.[9] Many such public employees are "[p]rison authorities [who] do not have the medical training to know whether a prisoner's medical condition has been properly diagnosed and treated." (*Watson, supra,* 21 Cal.App.4th at p. 843.) The Legislature could not have contemplated imposing a duty to do more than to *summon* medical care as it imposed that duty on "public employees," such as prison authorities, generally.

The distinction between failure to summon medical care—for which the State can be held liable under section 845.6—on the one hand, and negligence in providing care—for which the State is immune—on the other hand, was addressed in *Nelson v. State of California, supra,* 139 Cal.App.3d 72. There, the plaintiff was incarcerated when he complained of various medical problems that were symptoms of diabetes. (*Id.* at p. 75.) He filed a tort claim reciting the " 'failure of the Department of Corrections to diagnose and treat or allow claimant to maintain his ongoing medications.' " (*Id.* at p. 80.) The plaintiff's ensuing complaint was based on the failure to summon immediate, competent medical care under section 845.6. (*Nelson v. State of California, supra,* at p. 78.) *Nelson* held "as a matter of statutory interpretation, that the act of a doctor or other such professional who, in the course of treatment of a prisoner, fails to prescribe and/or provide the correct medication is [not] the legal equivalent to a failure to summon medical care as set forth in [§ 845.6]." (*Id.* at pp. 80–81.) "*Once a practitioner has been summoned* to examine and treat a prisoner, he or she is under a duty to exercise that degree of diligence, care, and skill such as is ordinarily possessed by other members of the profession. Failure to do so is malpractice. [Citation.] *Failure of a practitioner to prescribe or provide necessary medication or treatment to one he or she has been summoned to assist* is a breach of such duty and as such *is also medical malpractice and* clearly, as a matter of the plain meaning of the statutory language, *cannot be characterized as a failure to summon medical care.*" (*Id.* at p. 81, italics added.)

---

[9] The statute does impose liability on health care providers for injury proximately caused by malpractice. Castaneda sued the employee physicians and nurses in federal court, not in this state court action. The only defendant at issue in this action is the State.

*Watson, supra,* 21 Cal.App.4th 836, also considered the parameters of governmental liability under section 845.6. *Watson* determined section 845.6 "confers a broad general immunity on the public entity" and the duty to "summon" medical care under section 845.6 neither encompasses a duty to provide reasonable medical care, nor includes a concomitant duty to assure that prison medical staff properly diagnose and treat the medical condition, nor imposes a duty to monitor the quality of care provided. (*Watson, supra,* at pp. 841–843.)

The State argues that the judgment here must be reversed because on the facts presented at trial, it did summon health care as contemplated by section 845.6. It points to Dr. Leong and Nurse Pasha who were both summoned to examine Castaneda. The State argues its omissions thereafter are issues of medical malpractice, not a failure to summon. We agree.

On this record, the State summoned medical care for Castaneda. Indeed, it did more than summon, it treated him. Both Dr. Leong and Nurse Pasha assessed him; both included cancer as part of their differential diagnosis; both diagnosed his condition; and both *referred* him for further treatment, namely, medication and a biopsy. Under *Nelson* and *Watson,* the failure of these two public employees to provide further treatment, or to ensure further diagnosis or treatment, or to monitor Castaneda or follow up on his progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to *summon* medical care. (*Watson, supra,* 21 Cal.App.4th at pp. 841–843; *Nelson v. State of California, supra,* 139 Cal.App.3d at pp. 80–81.)[10]

The estate counters that Dr. Mekemson, who denied Dr. Leong's request for a biopsy "for illegitimate reasons" and without "medical justification," violated Department of Corrections's policy. As the wording of the estate's argument presupposes, the decision to deny Dr. Leong's referral involves the exercise of medical judgment. (*Nelson v. State of California, supra,* 139 Cal.App.3d at p. 81.) As such, that decision is not "subject to review in tort

---

[10] In its petition for rehearing, the estate focuses on the last clause of section 845.6 that subjects the State to liability for an employee's failure to "take reasonable action to summon" medical care. The estate argues its claim for violation of section 845.6 was "based on the State's failure 'to take reasonable action' to *carry out* the urgent urology consult and biopsy requested by both Dr. Leong and Nurse Pasha." (Italics added.). This argument conflates *summoning* medical care with the "carry[ing] out" of, or *provision of,* treatment. The estate is seeking to hold the State liable for failing to take reasonable action to furnish medical care, which is simply another way of arguing that the State negligently provided medical care, i.e., a consult or biopsy. Pursuant to *Nelson v. State of California,* the State is immune to liability for that conduct. (*Nelson v. State of California, supra,* 139 Cal.App.3d at pp. 80–81.)

suits for damages." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code, *supra,* foll. § 845.6, p. 459.) The estate similarly points to the three-week period between the time Castaneda was transferred to the second State facility and the time Nurse Pasha saw him as evidence of the failure to summon care for an "immediate need," where Dr. Leong's referral summoned a urology consult for cancer "ASAP, within one to two weeks." Yet, this too is a matter of professional judgment exercised during the provision of medical care. On the referral, Dr. Leong made the decision to circle "Routine," which according to policy *required a 90-day response time.* The decision not to circle "Urgent" or "Emergent" was a matter within Dr. Leong's medical judgment, but certainly not a failure to summon. Nurse Pasha saw Castaneda within the 90-day period. Although the public employee's knowledge of the need for immediate health care and the reasonableness of his or her actions in summoning care are factual questions for the jury (*Hart v. County of Orange* (1967) 254 Cal.App.2d 302, 307 [62 Cal.Rptr. 73]), on these facts, we hold that the State's employees were summoned to examine Castaneda; all omissions cited by the estate fall under the rubric of obtaining or providing medical care, for which actions the State is immune. Therefore, as a matter of law, the State is immune to liability under sections 845.6 and 844.6.

Citing *Jett v. Penner* (9th Cir. 2006) 439 F.3d 1091,[11] the estate argues that section 845.6 not only imposes a duty to summon care, but to summon care that the prisoner "actually needs." In *Jett,* the plaintiff injured his thumb while in state prison. He was examined and referred to an orthopedist to set and cast his fracture. However, despite repeated requests, he was never seen by an orthopedist over the several months he was in that facility. The plaintiff sued the prison doctors under the Eighth Amendment and section 845.6. (*Jett v. Penner, supra,* at p. 1095.) The Ninth Circuit reversed the summary judgment in favor of the defendants under that statute, holding that " 'immediate medical care' as used in the statute *includes both diagnosis and treatment* and [it] therefore conclude[d] the need for 'immediate medical care' can arise *more than once in relation to an ongoing serious medical condition. . . .* [I]f the California Legislature intended the duty of summoning immediate medical care to be limited *only to diagnosis or to the first time* there was need for treatment for a serious medical condition, it would have specified such. No such limitation on the stated statutory duty to summon immediate medical care is included within § 845.6. [¶] . . . The need for immediate medical care—treatment—arose as soon as his swelling subsided

---

[11] *Johnson v. County of Los Angeles* (1983) 143 Cal.App.3d 298 [191 Cal.Rptr. 704] is irrelevant as it involves the intersection of section 845.6 with sections 855.8 (diagnosing or proscribing for mental illness or addiction) and 856 (confinement of people for mental illness or addiction). The latter two statutes are not relevant here.

and his fracture could be reduced and a cast applied." (*Jett v. Penner, supra*, at p. 1099, italics added.) The estate's reliance on *Jett* is unavailing.

██ Apart from the fact that *Jett* is a federal decision and "a decision of a federal district court has no precedential value in this court; at best, it is persuasive authority only . . . [citations]" (*United Firefighters of Los Angeles City v. City of Los Angeles, supra,* 210 Cal.App.3d at p. 1115), the Ninth Circuit's application of section 845.6 ignores California authority interpreting that statute. California courts hold the failure to prescribe necessary medication or, once summoned to provide treatment, to ensure proper diagnosis, or to monitor the progress of an inmate that the public employee has been summoned to assist, are issues relating to the manner in which medical care is *provided,* and do not subject the State to liability under section 845.6 for failure to *summon.* (*Nelson v. State of California, supra,* 139 Cal.App.3d at pp. 80–81; *Watson, supra,* 21 Cal.App.4th at pp. 841–843.)

██ *Jett* also contradicts the Legislature's determination, in enacting section 845.6, not to require followup or monitoring of medical care. "As the bill [for section 845.6] was originally introduced the public employee was required to 'see' to it that a prisoner needing medical care received it. As amended he was required only to 'summon' medical care." (*Sanders v. County of Yuba* (1967) 247 Cal.App.2d 748, 753, fn. 3 [55 Cal.Rptr. 852].) Accordingly, California cases have repeatedly limited liability under the statute temporally "to serious and obvious medical conditions requiring immediate care." (*Watson, supra,* 21 Cal.App.4th at p. 841; see *Kinney v. County of Contra Costa* (1970) 8 Cal.App.3d 761, 770 [87 Cal.Rptr. 638].) Once summoned, the quality of medical care is a matter of medical policy and practice, imposing on medical practitioners a duty to exercise that degree of diligence, care, and skill possessed by other members of the profession, but it is not a violation of the employee's obligation to summon medical care under section 845.6. The limited nature of the duty to summon under section 845.6 makes sense given that the statute carves that duty out of a broad, general immunity. Were we to conclude the duty under section 845.6 includes furnishing, monitoring, followup, or subsequent care for the same condition, as the estate argues *Jett* does, we would be expanding the liability of the public entity beyond that contemplated by the Legislature.

██ The facts of this case, viewed in the light most favorable to the verdict, do not amount to a failure to summon medical care or a violation of section 845.6. Therefore, as a matter of law the State remains immune to liability for Castaneda's injuries. (§§ 844.6, 845.6.)[12]

---

[12] Given our holding we need not reach the State's remaining contentions on appeal.

## DISPOSITION

The judgment is reversed in its entirety with directions to enter judgment in favor of defendant State of California. Each party to bear its own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 1, 2013, S208851. Kennard, J., was of the opinion that the petition should be granted.